UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**SERGIO A. CUELLER,**

        **Plaintiff,**

        v.                                       Case No. 10-C-619

**MICHAEL J. ASTRUE,**

        **Defendant.**

---

## DECISION AND ORDER REVERSING THE DECISION OF THE COMMISSIONER AND REMANDING CASE

---

**I. FACTS AND HISTORY**

Sergio A. Cueller ("Cueller") has a history of back problems and had surgery for a herniated disc about 15 years ago. (Tr. 36.) Since that surgery, Cueller worked as a foundry worker and most recently as a truck driver, (Tr. 38), until February 28, 2005 when the pain got too intense and he felt he could no longer work, (Tr. 36). An MRI on April 5, 2005 revealed one disc bulge and two disc herniations. (Tr. 36.) Exacerbating Cueller's back problems and limiting the effectiveness of diagnostic testing and treatment options was the fact that at that time Cueller was morbidly obese. (Tr. 36-37.) In July 2006, Cueller underwent gastric bypass surgery and within 8 months, he lost 100 pounds. (Tr. 37.) By the time of the hearing before the administrative law judge ("ALJ") in this matter, Cueller, who stands 5'11" was down to 220 pounds. (Tr. 36.)

Following gastric bypass surgery, Cueller continued to suffer back problems. In March 2007 lumbar discography indicated multilevel disc disease. (Tr. 37.) An MRI on April 24, 2007 indicated that he had broad-based disc bulging and a small disc protrusion of the L3-L4 level and broad-based

disc bulging at the L5-S1 level. The impression was moderate to severe degenerative spondylosis and stenosis at two levels of the lumbar spine. (Tr. 37.) An EMG conducted the following day also revealed abnormalities and indicated mildly severe chronic neurogenic lesion at the l5-S1 level bilaterally. (Tr. 37.) Cueller reported significant pain, which he treated with narcotic medications. (Tr. 36.)

There is also some evidence in the record that Cueller suffered from depression and anxiety but the ALJ did not find these impairments severe and they are not discussed in the parties' present briefs. (Tr. 35.) Therefore, the court shall not discuss these impairments further.

Cueller filed a disability claim on February 7, 2006, alleging an onset date of February 28, 2005. (Tr. 33.) This claim was denied initially on July 20, 2006 and upon reconsideration on October 4, 2006. (Tr. 33.) Cueller requested a hearing before an ALJ on November 9, 2006 and a hearing was held nearly two-and-a-half years later on March 17, 2009. (Tr. 33.) Cueller appeared at this hearing with counsel. (Tr. 33.)

On March 31, 2009, the ALJ issued a written decision denying Cueller's claim. (Tr. 33-40.) Utilizing the five step process, see 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920, the ALJ concluded that Cueller's degenerative disc disease in the lumbar spine and obesity were severe impairments. (Tr. 35.) At Step 3, the ALJ concluded Cueller's impairments did not meet or medically equal a Listing, and at Step 5 he determined that through the date last insured, Cueller retained the residual functional capacity ("RFC") to perform sedentary work with additional limitations. (Tr. 36.) The ALJ's decision became a final decision of the Commissioner when the Appeals Council denied review on July 13, 2010. (Tr. 5.)

The present action was filed on July 22, 2010. (Docket No. 1.) This matter was reassigned to this court upon all parties consenting to the full jurisdiction of a magistrate judge. (Docket Nos. 4, 6, 7.) The plaintiff filed his initial brief on October 1, 2010, (Docket No. 11), the Commissioner

responded on December 1, 2010, (Docket No. 19), and the plaintiff replied on December 13, 2010, (Docket No. 20). The pleadings in this matter are closed and the matter is ready for resolution.

**II. STANDARD OF REVIEW: SUBSTANTIAL EVIDENCE**

In addressing the issues raised by the claimant, the court is limited to determining whether the ALJ's factual findings are supported by "substantial evidence." Young v. Barnhart, 362 F.3d 995, 1001 (7th Cir. 2004). The court may not re-weigh evidence, resolve conflicts in the record, decide questions of credibility, or substitute its own judgment for that of the Commissioner. Id.; Edwards v. Sullivan, 985 F.2d 334, 336 (7th Cir. 1993).

The substantial evidence burden is satisfied when the evidence is such that a reasonable mind might accept it as adequate to support a conclusion. Williams v. Apfel, 179 F.3d 1066, 1071 (7th Cir. 1999). Although a mere scintilla of proof will not suffice, Butera v. Apfel, 173 F.3d 1049, 1055 (7th Cir. 1999), substantial evidence may be something less than the greater weight or preponderance of the evidence, Young v. Sullivan, 957 F.2d 386, 388 (7th Cir. 1992). If the ALJ rejects uncontradicted evidence, reasoning for that rejection must be clearly articulated. Id.; Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987). If the ALJ's decision rests on the credibility determination, this court will overturn that determination only if it is patently wrong. Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000). Special deference is appropriate because the ALJ is in the best position to see and hear the witness and to determine credibility. Id. at 435.

When the Commissioner denies social security benefits, the ALJ is required to "build an accurate and logical bridge from the evidence to [his] conclusions" so that a reviewing court may afford the claimant meaningful review of the SSA's "ultimate findings." Blakes v. Barnhart, 331 F.3d 565, 569 (7th Cir. 2003) (citing Scott v. Barnhart, 297 F.3d 589, 595 (7th Cir. 2002)); Steele v. Barnhart, 290 F.3d 936, 941 (7th Cir. 2002). Further, the decision cannot stand if it lacks evidentiary support or "is so poorly articulated as to prevent meaningful review." Steele, 290 F.3d

3

at 940. Finally, if the ALJ committed an error of law, this court may reverse the Commissioner's decision, regardless of whether it is supported by substantial evidence. Pugh v. Bowen, 870 F.2d 1271, 1274 (7th Cir. 1989).

Simply stated, this court's role is not to look at all the evidence again and make an independent determination of whether the claimant is disabled. This court's role is very limited. If the ALJ complied with the rules and there is a good reason for his or her decision, even if it is a decision that the claimant strongly disagrees with, the court will not undo that decision.

### III. DETERMINING DISABILITY: A FIVE-STEP ANALYSIS

A person is disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). In determining whether the claimant was disabled, the ALJ applied the following five step inquiry: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairments meets or medically equals one of the impairments listed in 20 C.F.R. § 404, Subpart P, Appx. 1 ("Appendix 1"); (4) whether the claimant is unable to perform past relevant work; and (5) whether the claimant is incapable of performing work in the national economy. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920; Dixon v. Massanari, 270 F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer leads either to the next step, or on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, ends the inquiry and leads to a determination that a claimant is not disabled. Zurowski v. Halter, 245 F.3d 881, 885-86 (7th Cir. 2001) (citing Zalewski v. Heckler, 760 F.2d 160, 162 n.2 (7th Cir. 1985)). The claimant bears the burden of proof in the first four steps. Young v. Secretary of Health & Human Servs., 957 F.2d 386, 389 (7th Cir. 1992). If the claimant sustains that burden, at Step 5, the burden shifts to the Commissioner. Id. The ALJ is required to carefully consider and

explain in his or her decision the weight given to the opinions of state agency doctors and consultants. SSR 96-6p.

IV. ANALYSIS

### A. Step 3 Determination

Cueller contends that the ALJ erred at Step 3 because contrary to the ALJ's conclusion, Cueller meets or medically equals Listings 1.04A and 1.04C. (Docket No. 11 at 14.) Because the ALJ's entire Step 3 discussion is remarkably brief, the court shall fully recount it here:

> The undersigned has considered whether the claimant's back impairment meets the requirements of listing section 1.04. The claimant's representative argued that it does (Exhibit 10E). However, there is no motor loss or muscle weakness and most of the SLR tests were also negative, and thus the claimant's back impairment does not medically meet or equal a listing.

(Tr. 36.)

As the plaintiff's points out, the Seventh Circuit has held that "an ALJ should mention the specific listings he is considering and his failure to do so, if combined with a 'perfunctory analysis,' may require a remand." Ribaudo v. Barnhart, 458 F.3d 580, 583 (7th Cir. 2006) (citing cases). But an ALJ's failure to explicitly refer to a Listing by name does not, by itself, require remand, provided that it the ALJ's decision is sufficient to permit the reviewing court to trace the ALJ's reasoning. See Rice v. Barnhart, 384 F.3d 363, 369-70 (7th Cir. 2004). "An ALJ is not required to explicitly reference every conceivably applicable Listing and provide a detailed analysis as to why he finds that the claimant's impairments do not meet or medically equal the Listing." Levins v. Astrue, 2010 U.S. Dist. LEXIS 53222 (E.D. Wis. 2010).

In the present case, the ALJ's analysis was exceptionally terse. However, brevity does not, by itself, require remand. One judge may be able to say in a few sentences what it takes another pages to say. Rather, it remains the plaintiff's burden to demonstrate that the ALJ's discussion was too terse and thus the ALJ failed to properly articulate an explanation for his decision.

5

If a claimant shows that he meets all the criteria set forth in a Listing, he is presumptively disabled. Maggard v. Apfel, 167 F.3d 376, 380 (7th Cir. 1999) (citing 20 C.F.R. §§ 404.1525(a), 416.925(a)). The relevant Listings state:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
>
> or
>
> * * *
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Part 404, Subpart P, Appendix 1.

The ALJ did not explicitly mention Listings 1.04A and 1.04C but instead referred only generally to Listing 1.04. Although greater specificity would be preferred, nonetheless, in concluding that the claimant did not meet Listing 1.04, he necessarily found that the claimant did not meet Listings 1.04A or 1.04C. This conclusion is supported by substantial evidence.

It appears the ALJ focused primarily upon Listing 1.04A, in that his findings seem to quote from that Listing. However, weakness is an element of both Listing 1.04A and 1.04C and the ALJ explicitly found that the plaintiff was not suffering from this impairment. The plaintiff has failed to point to any evidence that suggests that he was, in fact, suffering from weakness. Therefore, the ALJ's conclusion that the plaintiff did not meet Listing 1.04A or 1.04C must be sustained.

However, this does not end the analysis under the Listing. Although the ALJ's conclusion that the claimant did not meet a Listing is supported by substantial evidence, there is still the

question of medical equivalence. If a claimant fails to show that he meets every one of the criteria in a Listing, he may nonetheless medically equal a Listing and thus still be found disabled at Step 3. 20 C.F.R. § 404.1526. As is most applicable to this case, 20 C.F.R. § 404.1526(b)(1)(i) states that a claimant may be found to medically equal a Listing if he has an impairment described in Appendix 1 but he "do[es] not exhibit one or more of the findings specified in the particular listing" or "exhibit[s] all of the findings, but one or more of the findings is not as severe as specified in the particular listing," provided that the claimant has "other findings related to [his] impairment that are at least of equal medical significance to the required criteria."

Medical equivalence is not a means by which a claimant may be found disabled simply by getting close to meeting a Listing; meeting 5 out of 6 criteria does not suddenly become good enough to find a claimant disabled. When a claimant fails to meet all the criteria of a Listing, that gap cannot just be ignored. Instead, the claimant must point to something to fill that gap, whether it is some other finding of equal medical significance, see 20 C.F.R. § 404.1526(b)(1)(ii), or a combination of impairments, see 20 C.F.R. § 404.1526(b)(3).

With respect to Listing 1.04C, in an apparent effort to demonstrate medical equivalence, the plaintiff discusses how he has an inability to ambulate effectively. As set forth in the quotation above, an inability to ambulate effectively is an element of Listing 1.04C. However, it is only one piece necessary to find that a claimant met or medically equaled the Listing. Yet this is the only element on which the plaintiff offers an argument; he offers no argument that he met or medically equaled any of the other elements of Listing 1.04C, i.e. "[l]umbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness." Only if there was reason to believe that the plaintiff met or medically equaled all elements of the Listing was the ALJ required to consider it. In

the absence of any argument to support a finding that the plaintiff medically equaled Listing 1.04C, the court shall not consider this matter further.

As for Listing 1.04A, in an effort to demonstrate medical equivalence, the plaintiff points to his other related impairments. The plaintiff states:

> Medical imaging and testing from April, 2007, showed mildly severe, chronic neurogenic lesion affecting the L5-S1 nerve roots, bilaterally. (Tr. 360)) There are medical findings of moderate-to-severe degenerative spondylosis. (Tr. 392-395) There are also findings that Low back pain/mobility are adversely affected with certain environmental conditions and that Mr. Cuellar is unable to change positions quickly. (Tr. 392-395)
>
> X-rays of the lumbar spine taken April 19, 2007 demonstrate[d] multilevel disc degenerative changes with severe disc space collapse at L5-S1. There appears to be a keyhole laminectomy at L5-S1. (Tr. 345-346) He has been diagnosed with failed back surgery.

(Docket No. 11 at 14-15.) Aside from his last statement, each of these claims is supported by an appropriate citation to the record.

The court concludes it was erroneous for the ALJ to offer nothing more than a conclusory statement that the plaintiff did not medically equal Listing 1.04A. The ALJ's substantive discussion, consisting of only a single sentence, was related solely to the question of whether the plaintiff met Listing 1.04A. In light of the plaintiff's numerous other related impairments, it was necessary for the ALJ to articulate his reasons why he concluded that these other findings related to the plaintiff's impairment were not at least of equal medical significance to the required criteria, 20 C.F.R. § 404.1526(b)(1)(ii), and if necessary, discuss why equivalence under 20 C.F.R. § 404.1526(b)(2) or (3) were inapplicable. Because the ALJ failed to adequately articulate any reason for his conclusion that the plaintiff did not medically equal a Listing under Listing 1.04, remand is necessary.

### B. Residual Functional Capacity

The ALJ concluded that the plaintiff retained the residual functional capacity for sedentary work, "except that he is further limited to only occasional climbing of ramps, stairs, ladders, ropes or scaffolds, only occasional balancing stooping, crouching, kneeling, or crawling, and must avoid even moderate use of moving machinery or even moderate exposure to unprotected heights or other hazards." (Tr. 36.) This conclusion was based upon the assessment of a state agency doctor who determined that the plaintiff was capable of sedentary work. In this assessment, completed on July 7, 2006, the state agency doctor opined that the plaintiff could occasionally lift 10 pounds, could frequently lift less than 10 pounds, could stand or walk at least 2 hours in an 8-hour day, could sit 6 hours in an 8-hour day, and had no additional limitations in his ability to push or pull. (Tr. 274.) This doctor also found no postural limitations, for example, in climbing, balancing, kneeling, or crawling. (Tr. 275.)

However, numerous of the plaintiff's treating medical professionals supported a finding of disability by concluding that he suffered far greater work restrictions. An advanced nurse practioner stated on August 23, 2006, that the plaintiff could sit or stand for no more than 5 minutes at a time and less than 2 hours in an 8-hour day, will need to be able to move at will, will require unscheduled breaks, was incapable of any lifting other than rarely lifting less than 10 pounds, and could never twist, stoop, couch, or climb ladders or stairs, and would be absent from work more than 4 days per month. (Tr. 313-17.)

A second nurse practitioner stated on December 7, 2007 that she saw the plaintiff once every three months for back pain and that he was incapable of any lifting, pulling, pushing, bending, or stooping, could stand and sit for no longer than an hour in an 8-hour day, and his medication resulted in impaired judgment and lethargy. (Tr. 353-55.) She stated his prognosis was fair and that these restrictions would expire in just under a year. (Tr. 353-55.)

A third nurse practioner completed an assessment on July 28, 2008 and similarly stated that the plaintiff's ability to occasionally or frequently lift was limited to less than ten pounds, he could stand, walk, or sit for less than 2 hours in an 8-hour day, and the plaintiff would have to change positions every 5 minutes to relieve discomfort. (Tr. 393.) The nurse practitioner indicated that the plaintiff would need to be able to shift from sitting to standing at will and may need to lie down at unpredictable times during a work day. (Tr. 394.) She stated that he could never twist, stoop, crouch, or climb stairs or ladders. (Tr. 394.) Finally, she estimated that the plaintiff would miss work more than 3 times per month because of his impairments. (Tr. 395.)

Finally the doctor who performed the plaintiff's gastric bypass surgery stated on August 22, 2006, that the plaintiff would be able to sit for more than 2 hours and stand for 20 minutes. (Tr. 310.) He stated the plaintiff would need to walk for about 10 minutes every hour-and-a-half during an 8-hour workday, and would need to occasionally take unscheduled breaks of about 15 minutes every 2 hours. (Tr. 310.) He found the plaintiff able to frequently lift up to 20 pounds and could lift 50 pounds occasionally. (Tr. 311.) The plaintiff was limited to only occasionally twisting, stopping, couching, or climbing ladders or stairs. (Tr. 311.) The plaintiff would be likely to have good days and bad days and would be expected to miss 3 days of work per month. (Tr. 312.)

The ALJ noted that the nurse practitioners' assessments were not entitled to controlling weight because they were not acceptable medical sources and attached minimal weight to these opinions because "they are somewhat inconsistent with other evidence of record; specifically the lack of significant treatment for the claimant's back impairment since the alleged onset date, and the activities of daily living reported by the claimant during this time." (Tr. 38.) Because the plaintiff "received conservative treatment for the past 4 years despite his allegation of severe back pain," the ALJ concluded "that his alleged symptoms are somewhat exaggerated." (Tr. 38.) The ALJ noted

that the plaintiff had no additional surgery, no additional epidural injections, and although prescribed a home exercise program, did not have any formal physical therapy. (Tr. 38.)

As for the doctor's assessment, the ALJ dismissed his conclusions on the basis that the August 22, 2006 questionnaire was completed shortly after the plaintiff's gastric bypass surgery in July of 2006, (Tr. 37), and was "somewhat inconsistent" in that the doctor "opined the claimant can sit for more than two hours at a time but could only sit for less than two hours in an eight hour workday," (Tr. 38).

The assessment that the ALJ chose to rely upon was that of a non-treating source which stands as a marked outlier in the record. Although not "acceptable medical sources," 20 C.F.R. § 404.1513(a), and thus not entitled to controlling weight, the conclusions of nurse practitioners are not valueless in an RFC determination. SSR 06-03p. The Administration must consider all relevant evidence when making a disability determination, including evidence from medical sources who are not "acceptable medical sources." SSR 06-03p (citing 20 CFR 404.1527(b) and 416.927(b)).

> With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.

SSR 06-03p.

The regulations explicitly permit the consideration of the opinions of these sources for the purposes of showing the "the severity of your impairment(s) and how it affects your ability to work." 20 C.F.R. § 404.1513(d). The same factors that apply to "acceptable medical sources" also apply to consideration of these other sources. SSR 06-03p. Although "acceptable medical sources" "are the most qualified health care professionals, and thus whether a source is an "acceptable

medical source" is a factor in assessing the weight to be afforded any medical opinion, depending upon the facts of the case,

> an opinion from a medical source who is not an 'acceptable medical source' may outweigh the opinion of an 'acceptable medical source,' including the medical opinion of a treating source. For example, it may be appropriate to give more weight to the opinion of a medical source who is not an "acceptable medical source" if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion. Giving more weight to the opinion from a medical source who is not an "acceptable medical source" than to the opinion from a treating source does not conflict with the treating source rules in 20 CFR 404.1527(d)(2) and 416.927(d)(2) and SSR 96-2p, "Titles II and XVI: Giving Controlling Weight To Treating Source Medical Opinions."

SSR 06-03p.

The fact that three separate medical professionals all reached largely identical conclusions at three separate times over a nearly 2-year span is strong evidence of the plaintiff's RFC that cannot be brushed aside with casualness exhibited by the ALJ.

Offering conclusory statements that the plaintiff's activities of daily living are inconsistent with his claimed impairments is insufficient to discount the opinions of treating professionals. At no point does the ALJ articulate what the plaintiff's daily activities include or how these activities suggest an ability for sedentary work on a sustained basis. Moreover, in this context the fact that the plaintiff has not undergone further surgery, epidural injections, or physical therapy is of little significance to the ultimate question of the plaintiff's RFC. The absence of certain treatments does not suggest that absence of a disability; for example, an individual with a terminal disease may discontinue all further treatment but in such a case, the absence of treatment surely does not automatically suggest an ability to work full time. There are any number of reasons why these interventions might not be medically appropriate for a particular individual.

Whether or not additional treatment would be appropriate is a medical determination outside the purview of an ALJ. The ALJ in the present case seems to have impermissibly played doctor and

speculated that in his view, a person with the sorts of limitations complained of by the plaintiff would be expected to have surgery, epidural injections, or physical therapy. The ALJ offers nothing to support this conclusion. Absent any support in the record from an appropriate medical source, it is not appropriate for an ALJ to conclude what further treatment would be expected for a person in the plaintiff's position.

As for the treating physician's assessment, the ALJ dismissed it on the basis that it was completed a month after the plaintiff's gastric bypass surgery and thus the ALJ speculated that the condition recounted in the report was reflective of an individual still recovering from surgery rather than indicative of the plaintiff's long-term prognosis. Notably, however, the ALJ made no mention of the fact that the doctor explicitly stated that the plaintiff's impairments lasted or could be expected to last at least 12 months. (Tr. 308.) Further, the ALJ attached much significance to the fact that there was an obvious mistake on the form when the doctor stated that the plaintiff could sit for more than two hours at one time, but could sit for less than two hours in an 8-hour workday. (Tr. 310.) Mistakes happen; if a single obvious mistake or internal contradiction was a basis for discounting an entire document, scarcely would an ALJ's decision ever be affirmed by a district court.

Moreover, it is significant that the state agency physician's assessment was the earliest of all the assessments with the most recent nurse practitioner assessment coming roughly 2 years later. Although relevant to the claimant's condition from the alleged onset date until the date of the assessment, the state agency physician's assessment has little value in answering the question whether the plaintiff's condition deteriorated subsequent to the state physician's assessment but prior to the date last insured.

Because the ALJ failed to appropriately consider the reports of the plaintiff's treating sources in accordance with SSR 06-03p, and specifically by failing to articulate appropriate reasons

as to why he was not crediting these reports and instead adopting the conclusions of the state agency's consultive examiner, remand is necessary.

### C. Consideration of Obesity

Finally, the plaintiff contends that the ALJ failed to appropriately consider his obesity and its impact upon his whether he met or medically equaled a Listing (Step 3) and his RFC (Step 5). The ALJ concluded that the plaintiff's obesity was a severe impairment. (Tr. 35.) Nonetheless, obesity was scarcely mentioned in the ALJ's decision aside from noting that morbid obesity may limit the surgical options for an individual concurrently suffering from back pain, a conclusory statement that the plaintiff's obesity exacerbated his back pain, and noting that his obesity is less of an issue following gastric bypass surgery in July 2006. (Tr. 37-38.)

Obesity once was a listed impairment but was removed from the listings effective October 25, 1999. SSR 02-1p (the plaintiff refers to SSR 00-3p but that Ruling was superseded by SSR 02-1p). Subsequently, the Social Security Administration issued Social Security Ruling 02-1p outlining how obesity should be considered in a disability determination. "[O]besity may increase the severity of coexisting or related impairments to the extent that the combination of impairments meets the requirements of a listing. This is especially true of musculoskeletal, respiratory, and cardiovascular impairments." SSR 02-1p. Further, obesity, by itself, may be found to meet or be medically equivalent to a listed impairment. Id. Obesity must be considered not only at Step 3, but throughout the sequential evaluation process. Id.

The ALJ's failure to adequately articulate his consideration of the plaintiff's obesity is an additional reason remand is required. Although it is undisputed that the plaintiff's obesity is far less of a factor after he underwent gastric bypass surgery, it was clearly a significant factor during the alleged period of disability, so much so that the ALJ concluded it was a severe impairment at Step 2. Nonetheless, as noted above, he scarcely discussed it.

Even if the plaintiff's weight loss could lead to the conclusion that he is not presently disabled, it does not preclude a finding that he was disabled at some prior period after his alleged onset but prior to the date last insured. The ALJ did not appear to consider this possibility. Rather, to the extent that he considered the plaintiff's obesity at all, it was generally in the context of noting the plaintiff's weight loss and noting that in light of this weight loss, it was less of an issue. Therefore, upon remand it shall be incumbent upon the ALJ to explicitly discuss the impact of the plaintiff's obesity upon the plaintiff's RFC determination and in consideration of whether the plaintiff medically equaled a Listing.

**V. CONCLUSION**

The numerous errors of the ALJ in this case necessitate remand. Upon remand, the ALJ must consider the claimant's obesity throughout the sequential evaluation process, most specifically at Steps 3 and 5. Additionally, at Step 3, the ALJ must consider whether the claimant medically equaled a Listing and if he concludes that the claimant does not medically equal a Listing, must articulate the basis for his conclusion in a manner sufficient for a reviewing court to trace his reasoning. Finally, at Step 5, rather than simply brushing aside the RFC assessments of the claimant's 3 separate nurse practitioners, the ALJ must consider these determinations in accordance with SSR 06-03p and further articulate the basis for any rejection of these treating sources.

. **IT IS THEREFORE ORDERED** that that the decision of the Commissioner is **reversed** and this case **remanded** for further proceedings. The Clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this <u>5th</u> day of May, 2011.

<u>s/AARON E. GOODSTEIN</u>
U.S. Magistrate Judge
